## TEXAS ASSOCIATION OF CON-CERNED TAXPAYERS, INC., Plaintiff-Appellant,

v.

## UNITED STATES of America, Defendant-Appellee.

No. 84–5021.

United States Court of Appeals, Fifth Circuit.

Sept. 30, 1985.

Rehearing and Rehearing En Banc Denied Oct. 29, 1985.

Sam Kazman, Ronald A. Zumbrun, Washington, D.C., for plaintiff-appellant.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Michael L. Paup, Chief, Appellate Sec., Richard Farber and Michael J. Roach, Washington, D.C., for defendant-appellee.

Before REAVLEY and JOLLY, Circuit Judges, and SANDERS,* District Judge.

SANDERS, District Judge:

Texas Association of Concerned Taxpayers, Inc. (TACT) appeals the district court's judgment dismissing its action under rule 12(b)(6), Fed.R.Civ.P. We affirm.

## I.

TACT commenced this suit under 26 U.S.C. § 7422 for the refund of $3.11 of federal excise tax paid on its telephone bills. This sum is attributable to the enactment of Section 282(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324 (TEFRA). TACT contends that the passage of TEFRA violated the origination clause contained in article I, section 7, clause 1 of the United States Constitution.

The origination clause states:

All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

On December 5, 1981, the House of Representatives passed a bill entitled the Miscellaneous Revenue Act of 1981, H.R. 4961. As the bill number indicates, this bill had originated in the House. In the form passed by the House, H.R. 4961 was intended to reduce taxes. The total revenue effect of the tax provisions were projected to be a reduction of revenues ranging from $69 million in fiscal year 1982 to $301 million in fiscal year 1986. H.R.Rep. No. 404, 97th Cong., 1st Sess. at 38. Complaint ¶ 15.

Upon reaching the Senate, H.R. 4961 was referred to the Senate Finance Committee, which struck the entire text of the bill after the enacting clause and replaced it with a massive tax-increasing proposal. Instead of reducing the amount of revenue collected, the bill as amended proposed to increase tax revenues by over $92 billion in fiscal years 1983–85, and by over $218 billion through fiscal year 1987. The bill passed by the Senate on July 23, 1982, was largely unchanged from that reported out of the Committee. Complaint ¶ 16.

Upon the bill's return to the House, Representative Rousselot offered a resolution to the House which proposed to resolve that the Senate's amendments to H.R. 4961 contravened the origination clause. The Chairman of the House Ways and Means Committee moved to table the resolution. The motion to table carried the House. The Chairman, at the direction of the Committee, then moved to send H.R. 4961 to conference with the Senate, without first referring it back to the House Committee on Ways and Means. The House agreed to that motion after considerable constitutional debate, and the bill was sent to conference. Complaint ¶ 17; *Moore v. U.S. House of Representatives*, 733 F.2d 946, 949 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985).

On August 17, 1982, the conference committee reported its version of H.R. 4961, which closely resembled the Senate-passed

---

* District Judge of the Northern District of Texas, sitting by designation.

bill. The conference bill would increase tax revenues by $91.5 billion in fiscal years 1983–85 and by over $205 billion in fiscal years 1983–87. Complaint ¶ 19. On August 19, 1982, the House and the Senate each passed the bill and H.R. 4961 was signed into law by the President on September 3, 1982. Complaint ¶ 20.

TACT does not claim that the bill that became TEFRA did not originate in the House of Representatives. Rather, it contends that upon its origination it was not a bill for "raising revenue" within the meaning of the origination clause because the net effect of the bill would have been to reduce the amount of revenue collected. Thus, it is argued, when the Senate amended H.R. 4961 so that the net effect of the bill's provisions was to increase the revenue yield, the bill became one for raising revenue for the first time and it originated improperly in the Senate.

TACT also asserts that if H.R. 4961 in its original form is a revenue-raising measure, the Senate's amendments are unlawful as exceeding the scope of the Senate's power to amend with respect to any type of bill.

## II.

■ TACT's primary claim turns on whether the phrase in the origination clause referring to "bills for raising revenue" means bills that increase revenue or whether it refers to all bills relating to revenue—revenue-increasing or revenue-decreasing—in which case TEFRA constitutionally originated in the House. We are of the opinion that this issue poses a nonjusticiable controversy.

■ The doctrine of nonjusticiability based on the presence of a political question is part and parcel of the separation of powers and is concerned with whether an issue is appropriate for judicial determination. *Metzenbaum v. FERC*, 675 F.2d 1282 (D.C.Cir.1982). A question is properly deemed political when resolution is committed by the Constitution to a branch of the federal government other than the judiciary. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

The Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), observed that each of the varying formulations which may be used to describe a nonjusticiable political question "has one or more elements which identify [the question] as essentially a function of separation of powers." The Court then listed the elements found in previous cases:

... Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710; *See also INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317 (1983).[1]

■ Every challenge to the constitutionality of a statute is not transformed into a political question because the claim is one against Congress' authority to enact the law. *Chadha*, 103 S.Ct. at 2779. The judicial branch is, of course, the final arbiter of the constitutionality of a statute. *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803).

This case differs from *Chadha*, where the Supreme Court held that review of the

---

1. On the other hand, "the political question doctrine has been described as no doctrine at all, but rather a group of quite different questions which have been characterized as political."

*Citizens for Management of Alaska Lands v. Department of Agriculture,* 447 F.Supp. 753, 755 (D.Alaska 1983).

"legislative veto" scheme was not barred by the political question doctrine. In *Chadha,* the Court was faced with a situation in which the House purported to exercise full legislative authority with no provision for passage by the Senate and presentation to the President. After examining the "explicit, unambiguous" constitutional exceptions that authorized unilateral House action, the Court concluded that the House was without a permissible basis of authority for its action. 103 S.Ct. at 2786–87. *See also Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (review is proper when House action is without constitutional basis of authority). By contrast, the manner of TEFRA's passage is not an issue of sheer lack of authority bounded by "explicit, unambiguous" cornerstones, but rather one of the permissible interpretations of language by which Congress is to guide the allocation of its essential legislative responsibilities.

"Raising revenue" certainly is an ambiguous term. TACT vehemently contends that history dictates an interpretation equating it with "increasing revenue," *see also Bertelsen v. White,* 65 F.2d 719, 722 (1st Cir.1933) ("It is not a bill to raise revenue.... On the contrary, it diminishes the revenue of the government."), but all contemporary courts have adopted the construction apparently given it by Congress, i.e. "relating to revenue." *See, e.g., Armstrong v. United States,* 759 F.2d 1378, 1381–82 (9th Cir.1985); *Wardell v. United States,* 757 F.2d 203, 205 (8th Cir. 1985).

There are no judicially discoverable standards of resolution different or superior to those employed by Congress. Indeed, the Ninth Circuit was propelled to its decision by the precedents and debates of the Congress itself. 759 F.2d at 1381. It would be difficult to formulate any standard of constitutionality to adequately guide Congress down the chutes and rapids that it must continually face in dealing with this clause. The fluctuations in national income and corresponding shifts in revenue yields make any label of "increasing revenue" a slippery and potentially chameleonic one.

The same bill may have an effect of increasing revenue under certain economic conditions and decreasing revenue under others. *See Twin City Bank v. Nebeker,* 167 U.S. 196, 202, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897) ("What bills belong to that class [of bills for raising revenue] is a question of such great magnitude and importance that it is the part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject."); *Dyer v. Blair,* 390 F.Supp. 1291, 1302, n. 26 (N.D.Ill.1975) (three-judge court).

Judicial second-guessing of the meaning of the origination clause would also inherently express a "lack of the respect due [a] coordinate [branch] of government." *Baker,* 369 U.S. at 217, 82 S.Ct. at 710. The House is certainly aware of its constitutional prerogatives and spent considerable time debating the application of the clause to the circumstances before it, making especially appropriate the customary deference accorded the judgments of Congress. *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). Indeed, resolution of this particular controversy has been found to require a court "to meddle in the internal affairs of the legislative branch." *Moore, supra,* 733 F.2d at 956.

Yet another consideration militating against review, presaging the final two *Baker* factors, is "the appropriateness under our system of government of attributing finality to the action of the political departments." *Coleman v. Miller,* 307 U.S. 433, 454, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939); *Dickson v. Ford,* 521 F.2d 234, 236 (5th Cir.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976). Unlike legislation violating the establishment clause or the requirement of bicameralism, the claimed defect in TEFRA cannot be discerned by an examination of the law's text. Indeed, the engrossed copy of TEFRA presented to the President bears the certification of the Clerk of the House that

the act "originated in the House of Representative." Brief of Appellee, Appendix B at 30.

In *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), the Supreme Court rejected a challenge to a revenue act in which it was claimed that certain portions of the act, as appearing in the engrossed version, were never actually considered by Congress, an allegation at least as egregious as that argued by TACT. The Court declined to look beyond the enrolled bill to the journals of Congress, the reports of committees or other Congressional documents to determine the true contents of the bill. Justice Harlan noted:

> We recognize, on one hand, the duty of this Court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws that are to operate wherever the authority and jurisdiction of the United States extend. On the other hand, we cannot be unmindful of the consequences that must result if this Court should feel obliged in fidelity to the Constitution, to declare that an enrolled bill, on which depend public and private interest of vast magnitude, and which has been authenticated by the signatures of the presiding officers of the two houses of Congress, and by the approval of the President, and been deposited in the public archives [is invalid].

143 U.S. at 669, 12 S.Ct. at 496.

This Court cannot be blind to the potential for vast fiscal upheaval if we undertook a *de novo* review of the Congressional interpretation given the origination clause.

We recognize that other courts faced with challenges to TEFRA have proceeded to adjudicate the merits of the case and

proclaim a definition of "raising revenue" to bind Congress. We decline to follow such rulings.[2] The Supreme Court's encounters with the origination clause likewise do not foreclose our approach. In *Millard v. Roberts,* 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906) and *Twin City Bank v. Nebeker, supra,* the Court examined the status under the origination clause of bills that only incidentally affected revenue. In so doing, the Court applied a principle first announced in *United States v. Norton,* 91 U.S. (1 Otto) 566, 569, 23 L.Ed. 454 (1876). In *Norton,* the Court deferred to Congress' definitional judgment as to the meaning of "revenue laws" for purposes of the origination clause. Justice Swayne wrote that "the construction of this limitation is practically well settled by the uniform action of Congress." 91 U.S. (1 Otto) at 569. In *Flint v. Stone Tracy Company,* 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911), interpretation of the terms of the clause was not at issue.

Accordingly, we hold that where, as here, a constitutional provision governing the mode of internal operation of Congress contains a word or phrase susceptible of more than one meaning, and Congress has given that word or phrase an interpretation consistent with the limitations on authority contained in the provisions, the courts should not intrude into the deliberative processes of Congress to modify that judgment. Such an inquiry poses a nonjusticiable political question.

### III.

TACT also contends that the Senate's amendment of TEFRA, substituting a substantial tax increase for the House-authored tax cut, altered the legislation beyond the permissible scope of amendment.

---

**2.** A similar divergence in views has arisen in the scholarly literature concerning the meaning to be ascribed to the terms "other high Crimes and Misdemeanors" in art. II, § 4. The commentators are divided on where the power to ascribe meaning to these two terms resides and whether the final effectiveness of the Congressional judgment of conviction must await disposition in the federal courts. *See* Bator, et al., *Hart and Wechsler's The Federal Courts and the Federal System (2d ed.) (1981 supp.) at 95.*

■ Although some of the same considerations as noted above are present, suggesting nonjusticiability of this issue of Congressional internal procedure,[3] TACT's contention is squarely foreclosed by *Flint, supra,* in which the Senate's substitution of a corporation tax for a House-drafted inheritance tax was upheld by the Supreme Court, which stated that "the amendment was germane to the subject matter of the bill and not beyond the power of the Senate to propose." 220 U.S. at 143, 31 S.Ct. at 346. "Subject matter" appears to merely require that both the amendment and the amended portion address revenue collection. *Accord Boday v. United States,* 759 F.2d 1472 (9th Cir.1985); *Armstrong v. United States,* 759 F.2d 1378 (9th Cir.1985); *Harris v. United States,* 758 F.2d 456 (9th Cir.1985); *Wardell v. United States,* 757 F.2d 203 (8th Cir.1985); *Liljenfeldt v. United States,* 588 F.Supp. 966 (E.D.Wis. 1984), *affirmed,* 753 F.2d 1077 (7th Cir. 1977); *Rowe v. United States,* 583 F.Supp. 1516 (D.Del.1984), *affirmed,* 749 F.2d 27 (3d Cir.1984); *Kloes, supra; Milazzo v. United States,* 578 F.Supp. 248 (S.D.Cal. 1984). The Senate's amendment, adding new taxes, was germane to the subject matter and thus within the range of amendments permitted by the origination clause. The district court's dismissal of this theory was proper.

AFFIRMED.

---

**3.** One court addressing this contention observed that to entertain this argument would cast "a constitutional cloud over every revenue-raising measure which had been modified in the Senate in any way." *Kloes v. United States,* 578 F.Supp. 270, 273 (W.D.Wis.1984).