**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William Howard NEWMAN,
Defendant–Appellant.**

**No. 88–3499.**

United States Court of Appeals,
Sixth Circuit.

Argued May 22, 1989.

Decided Nov. 9, 1989.

---

Terry Lehmann argued, Office of the U.S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

William S. O'Brien, O'Brien & Bauer, Findlay, Ohio, for defendant-appellant.

Before WELLFORD and MILBURN, Circuit Judges; and ALDRICH, District Judge.[*]

ANN ALDRICH, District Judge.

Defendant-appellant William Howard Newman appeals his conviction, after a jury trial, on one count of interstate transportation of a stolen motor vehicle, in violation of 18 U.S.C. § 2312, and on one count of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. He raises four assignments of error, all of which are without merit.

### I.

In October 1986, Newman, an admitted alcoholic, was serving time at the Federal Correctional Institution in Sandstone, Minnesota for the interstate transportation of a stolen tractor-trailer rig. Pursuant to an arrangement whereby he would serve the balance of his sentence at the Leavenworth Prison Camp, Newman was granted a furlough and allowed to travel unaccompanied to Leavenworth, Kansas. While at the Minneapolis–St. Paul airport, however, he entered an airport lounge and drank several "double shots" of Jack Daniels bourbon and an indeterminate amount of beer. Newman testified that, a few days before the furlough, he sustained an injury to his neck, and that this consumption of alcohol was occasioned by his need to ease the pain of the injury. Newman also testified that he had lost nearly all recollection of the events that occurred during the en-

---

[*] Honorable Ann Aldrich, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

suing eight days. The evidence disclosed that Newman left the airport and somehow made his way to Cincinnati, where he broke into a fenced-in parking lot and stole a 1985 Peterbilt tractor. A short while later, Newman drove to a northern Cincinnati suburb and stole a flatbed trailer loaded with Celotex roofing shingles. He hitched the trailer to the tractor and drove more than 300 miles to Chicago.

Shortly after arriving in Chicago, Newman hired several men to unload the shingles, which he then offered to sell for $1.00 a bundle. He also attempted to sell the tractor-trailer rig for $2,000, after acknowledging to a prospective purchaser that he had no title or other "papers" for the truck. The prospective purchaser became suspicious and notified the Chicago police, who arrested Newman. Newman gave the officers a false name and claimed he had stolen the rig from the Milwaukee, Wisconsin area. The next morning Newman gave his real name to FBI agents and confessed that he was an escaped federal prisoner. After being read his *Miranda* rights, Newman indicated that he understood them and signed a printed waiver form. Then, as one of the agents took notes, Newman confessed to the theft of the rig in Cincinnati, and recounted in considerable detail the accompanying events. Newman then signed, adopting as his own, the agent's transcription of his confession and report of those events.

At trial, the testimony of a psychologist, Dr. Roy B. Lacoursiere, formed a critical part of Newman's defense. Through this testimony, and through other evidence of his chronic alcoholism, Newman attempted to show that he suffered from "Acute Brain Syndrome," a condition that precluded both his forming the requisite *mens rea* for the commission of a crime and for the voluntary confession of his guilt. The district court allowed extensive testimony from Dr. Lacoursiere, and instructed the jury that evidence of Newman's condition could be considered in determining whether he was capable of forming the *mens rea*

necessary for commission of the offenses charged. The judge had earlier determined, after conducting a suppression hearing, that evidence of the voluntariness of Newman's confession should go to the jury.

After the judge denied Newman's motion for acquittal, the jury convicted Newman on both counts in the indictment. He was sentenced to five years on the first count and ten years on the second, to be served concurrently. The judge also imposed a special assessment of $100 pursuant to the Comprehensive Crime Control Act, 18 U.S.C. § 3013.

In this appeal, Newman raises four assignments of error:

1) the district court erred in failing to grant Newman's motion for a directed verdict or acquittal based upon Newman's alleged inability to form the requisite *mens rea* to be convicted of an intentional crime;

2) the district court erred in sentencing Newman under pre-guideline standards;

3) the district court erred in admitting Newman's post-arrest statements as a voluntary confession;

4) the district court's imposition of a special assessment pursuant to 18 U.S.C. § 3013 violated Newman's federal constitutional rights because § 3013 is unconstitutional.

These issues are treated in turn.

## II.

Newman's first assignment of error concerns the degree to which his alleged involuntary intoxication precluded his forming the requisite *mens rea* for commission of the offenses charged. Newman insists that he is not here pleading anything resembling an insanity defense. Neither, he claims, is he relying on notions of "diminished responsibility" or "diminished capacity," the use of which as defenses to criminal charges has been restricted by the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17.[1] His alleged involuntary in-

---

1. In fact, it seems well settled that both an insanity defense and a diminished capacity de-

fense are possible even after the enactment of 18 U.S.C. § 17. As the Ninth Circuit observed,

toxication, rather, relates only to his capacity to have possessed, at the relevant time, the mental state required for criminal culpability.

■ It is well established that intoxication, whether voluntary or involuntary, may preclude the formation of specific intent and thus serve to negate an essential element of certain crimes. *See, e.g., United States v. Molina–Uribe,* 853 F.2d 1193 (5th Cir.1988); *United States v. Twine,* 853 F.2d 676 (9th Cir.1988); *United States v. Kurka,* 818 F.2d 1427 (9th Cir.1987); *United States v. Echeverry,* 759 F.2d 1451 (9th Cir.1985). The government concedes that intoxication might still be a factor vis-a-vis a state of mind required for the commission of a certain offense, although it also offers reasons why its use as a defense in this case is inappropriate.

Whatever the legal status of Newman's attempt to invoke intoxication as a defense to his criminal conduct, the trial judge permitted a jury instruction allowing such evidence to be considered for that purpose. The judge also allowed considerable testimony from Newman's expert, Dr. Lacoursiere, pertaining to Newman's capacity knowingly or willfully to commit the criminal acts charged. Although given ample opportunity to accept intoxication as a defense, the jury rejected the argument by returning a guilty verdict.

Newman's complaint on appeal cannot, under these circumstances, concern any prejudice he suffered as a result of the district court judge's conduct of the trial. What he instead appears to be urging is that the testimony of Dr. Lacoursiere, together with other evidence of his alcoholism, so outweighed the government's evidence of intentional and deliberate criminal behavior that it was error for the trial judge to deny his motion for acquittal. Newman thus asks us to accept his prof-

fered evidence of involuntary intoxication as not only relevant to the issue of his criminal responsibility, but also as dispositive of that issue.

A trial court must order the entry of a judgment of acquittal if "the evidence is insufficient to sustain a conviction ..." of the offenses charged. Fed.R.Crim.P. 29(a) (1966). The seminal case setting the standard for granting a judgment of acquittal in this Circuit is *United States v. Adamo,* 742 F.2d 927 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985):

> It is well established that a trial judge confronted with a Rule 29 motion must consider all of the evidence in a light most favorable to the government and grant the motion when it appears to the Court that the evidence is insufficient to sustain a conviction.... The government must be given the benefit of all inferences which can reasonably be drawn from the evidence ... even if the evidence is circumstantial.... It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt.

*Adamo,* 742 F.2d at 932; *see also United States v. Gibson,* 675 F.2d 825 (6th Cir.), *cert. denied* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982) (if evidence is such that a reasonable mind might fairly find guilt beyond reasonable doubt, court should deny motion for judgment of acquittal).

■ We have no difficulty concluding that the evidence adduced by the government at trial, particularly when viewed in a light most favorable to the government, was sufficient to sustain Newman's conviction.[2] That Newman was, at the relevant times, capable of rational thought and intentional behavior is abundantly supported by evidence relating to his performance of

---

"these complexities are largely semantic." *United States v. Twine,* 853 F.2d 676, 679 (9th Cir. 1988). *See also United States v. Pohlot,* 827 F.2d 889, 897 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).

**2.** It is certainly not necessary for the government to have rebutted Newman's expert testimo-

ny with its own such testimony. Neither a court nor a jury is bound to accept an expert's testimony to the exclusion of all other evidence. *See United States v. Battista,* 646 F.2d 237, 246 (6th Cir.), *cert. denied,* 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981).

numerous intricate and delicate tasks in the course of committing his crimes. Newman had little difficulty connecting the Peterbilt tractor, with its various air and electrical lines, to the flatbed trailer and driving the rig more than 300 miles to Chicago. He was capable of conducting business with the men he hired to unload the trailer and with those he approached about buying the shingles and the rig itself, and was sufficiently possessed of mind to fabricate a story to mislead his arresting officers. He was able, moreover, to identify himself the following morning to FBI agents, to whom Newman's answers and general demeanor appeared appropriate and rational. Even Dr. Lacoursiere testified that, on November 6, when Newman was examined in the jail's infirmary, he was suffering from only "mild alcoholic withdrawal" and was completely oriented as to time, place, and person. Even when counterbalanced by the other evidence from Dr. Lacoursiere and the diagnosis of Acute Brain Syndrome, then, the government's evidence of rational, deliberate criminal behavior is more than ample to sustain Newman's conviction.

Newman's reliance on two cases that have considered the defense of intoxication, *United States v. Henderson*, 680 F.2d 659 (9th Cir.1982); *United States v. Burnim*, 576 F.2d 236 (9th Cir.1978), is for various reasons misplaced. *Burnim*, in which the court of appeals affirmed the district court's finding that the defendant's alleged insanity was the product of his own voluntary intoxication and so rejected the defense, obviously cannot be invoked in support of Newman's cause. *Henderson*, moreover, was decided before enactment of the Insanity Defense Reform Act of 1984, which, among other things, shifted to defendants the burden of proving insanity or other mental defect. Thus, when the court held that the government had failed to prove that defendant, a certified paranoid schizophrenic, could control his desire to drink, it applied a different burden of proof from that which Newman confronts here. The *Henderson* court was not asked to determine whether the defendant, if the burden had rested on him, would have been able to demonstrate inability to control his drinking. The court did, however, reaffirm an earlier opinion that chronic alcoholism would not itself supply an excuse where a defendant is aware of the problem and chooses to drink anyway. *See Kane v. United States*, 399 F.2d 730, 735–36 (9th Cir.1968), *cert. denied*, 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969). The *Henderson* court also relied on the defendant's diagnosis as a paranoid schizophrenic, a psychiatric category that appears to enjoy a more respectable status, and thus to pack more of an exculpatory punch, than does Newman's Acute Brain Syndrome.

Newman has, in short, failed to produce any persuasive rationale or authority for the conclusion he urges this Court to adopt. We are persuaded that sufficient evidence was produced to allow a reasonable jury to find that Newman possessed the requisite *mens rea* for commission of the offenses charged, and that the district court therefore committed no error in denying Newman's motion for judgment of acquittal.

### III.

Newman's second assignment of error asserts that, because his offense was committed between the enactment and the effective date of the Sentencing Reform Act of 1984, he ought to have been sentenced under the guidelines established by that Act. Newman believes this bit of twisted logic to be supported by *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), and *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), cases which clarify the conditions under which a law should be held to violate the *ex post facto* prohibition of the United States Constitution. "The critical question," according to the *Weaver* Court, "is whether the law changes the legal consequences of acts completed before its effective date." *Id.* at 31, 101 S.Ct. at 965. Newman suggests that, because the Sentencing Reform Act did *not* change the legal consequences of his acts, which were committed prior to the Act's effective date, application of the guidelines would have no

*ex post facto* implications, and therefore that its application was *required* in his case. The fact that a court may not retroactively apply laws that change the legal consequences of certain acts does not, of course, imply that it *must* retroactively apply laws that do not.

The specific provisions of the Sentencing Reform Act obviate any discussion of its retroactivity. The Act provides that the sentencing guidelines "shall apply only to offenses committed after the taking effect of this chapter." Pursuant to an amendment to the Act passed on December 7, 1987, the Act's effective date was expressly moved to November 1, 1987. P.L. 98–473, 98 Stat.1987 at § 235(a)(1) (as amended by P.L. 99–217 §§ 2 and 4, 99 Stat. 1728, and P.L. 99–646, § 35, 100 Stat. 3599). *See Farese v. Story,* 823 F.2d 975, 976–77 (6th Cir.1987) ("In the absence of an explicit retroactivity provision, the amendment does not apply to [a defendant's] sentence; *See Warden, Lewisburg Penitentiary, v. Marrero,* 417 U.S. 653, 659–64, 94 S.Ct. 2532, 2536–39, 41 L.Ed.2d 383 (1974)...."); *accord United States v. Haines,* 855 F.2d 199, 200–01 (5th Cir.1988) ("[I]t is clear that when Congress enacted the Sentencing Reform Act of 1984 it intended the new guidelines, when they were developed, to apply only to offenses committed on or after their effective date.") "As to an offense committed prior to the effective date, the preexisting law will apply as to all substantive matters including the imposable sentence." *United States v. Byrd,* 837 F.2d 179 (5th Cir.1988) (*quoting* Sen.Rep. 225, 98th Cong., 2d Sess. 189, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3372); *see also United States v. Rewald,* 835 F.2d 215, 216 (9th Cir.1988). The guidelines thus apply only to offenses committed after November 1, 1987. Because Newman's offenses were committed in November 1986, he was properly sentenced under pre-guidelines standards. His second assignment of error is accordingly overruled.

## IV.

Newman's third assignment of error is related to the first, as it concerns the role his alcoholism may have played in an act significant to his prosecution. His confession to FBI agents the morning after his arrest, and his capacity to appreciate its significance, forms the basis of his third asserted error. In an argument that parallels his first, Newman claims that, because Dr. Lacoursiere's testimony (to the effect that Newman was incapable of understanding the significance of his statements to the FBI agents) was uncontradicted by other expert testimony, the district court erred in denying his motion to suppress evidence of his confession. Again, we disagree.

■ In considering Newman's motion to suppress, the district court judge was not required to accept Lacoursiere's testimony. *See United States v. Battista,* 646 F.2d 237, 246 (6th Cir.), *cert. denied,* 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981). He instead properly considered the totality of the circumstances and decided that evidence of Newman's confession, along with all the other evidence, should be evaluated by the jury. This Court need only determine whether this ruling was supported by substantial evidence, *United States v. Lambert,* 771 F.2d 83, 89 (6th Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985), or whether it was clearly erroneous, *United States v. Coleman,* 628 F.2d 961, 963 (6th Cir.1980).

■ Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary. *See Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *McCall v. Dutton,* 863 F.2d 454 (6th Cir.1988). In *Connelly,* the defendant approached a police officer and insisted on confessing to a murder committed a year earlier. He was later diagnosed as suffering from a psychosis that interfered with his ability to make free and rational choices, on which ground the Colorado Supreme Court affirmed an order that his confession be suppressed.

The United States Supreme Court reversed, noting that the police had done nothing to extract the confession and were not otherwise responsible for respondent's condition or for the way it was manifested. "We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." [3] *Connelly*, 479 U.S. at 167, 107 S.Ct. at 522. Of respondent's exclusive reliance on facts about his mental condition, the Court said: "Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained." 479 U.S. at 166, 107 S.Ct. at 521.

In *McCall v. Dutton*, 863 F.2d 454 (6th Cir.1988), this Circuit distinguished three conditions that a confession must satisfy to be considered involuntarily given:

> Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." ... Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused.... Finally, petitioner must prove that his will was overborne *because* of the coercive police activity in question. If the police misconduct at issue was not the "crucial motivating factor" behind petitioner's decision to confess, the confession may not be suppressed....

*Id.* at 459 (citations omitted).

■ Newman does not allege, let alone demonstrate, that his confession or waiver of rights was in any way attributable to the FBI agents' misconduct. He instead puts forward the legally untenable proposition that his alleged involuntary intoxication, as attested to by Dr. Lacoursiere, by itself rendered his statements involuntary. Even if all doubts about Newman's mental condition were resolved in his favor, that conclusion would still be legally insufficient to establish that Newman's statements were involuntary. His third assignment of error is for this reason overruled.

### V.

In his fourth assignment of error, Newman contends that the $100 special assessment imposed by the district court pursuant to 18 U.S.C. § 3013 violated his due process and equal protection rights. However, in his reply brief, Newman abandons his equal protection claim, and suggests that, as a "bill for raising revenue" that originated in the Senate rather than in the House of Representatives, § 3013 violates the origination clause of the Constitution.

The origination clause provides:

> All Bills for raising revenue shall originate in the House of Representatives; but the Senate may propose or concur with the Amendments as on other Bills.

U.S. Const. art. I, § 7, cl. 1. To make good on his claim, then, Newman must show both that § 3013 is a "bill for raising revenue" within the meaning of the origination clause, and that it indeed originated in the Senate. The government argues 1) that Newman's claim raises a non-justiciable, political question which this Court ought not consider, and 2) that were it to entertain Newman's claim, the Court should find that § 3013 neither qualifies as a "revenue bill" nor as a bill that originated in the Senate. Although we disagree with the government that Newman's origination clause challenge presents a non-justiciable issue, we do agree that it is not essentially a revenue bill and so uphold its constitutionality. Accordingly, we need not refer

---

**3.** As applied to confessions and for purposes of due process, then, the term "involuntary" should be construed to refer not to some *property* a defendant's confession may be said in itself to have or lack, but rather to a certain *relation* between the confession and the method or conduct of law enforcement officials in procuring it. *Cf. Connelly*, 479 U.S. at 164, 107 S.Ct. at 520 (that courts have of late placed more emphasis on a defendant's mental condition "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional voluntariness").

to the conflicting legislative history of this statute to determine the house of Congress from which it emerged.

*Justiciability*

According to the Supreme Court, a case presents a nonjusticiable, political question when any one of the following circumstances is present:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; a lack of judicially discoverable and manageable standards for resolving it; the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; an usual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *see also INS v. Chadha,* 462 U.S. 919, 941, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317 (1983). The Supreme Court has in the past undertaken to review on the merits origination clause challenges to various statutes undeterred by justiciability concerns. *See, e.g., Millard v. Roberts,* 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906); *Twin City Bank v. Nebeker,* 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897). In *United States v. Texas Association of Concerned Taxpayers,* 772 F.2d 163 (5th Cir.), *cert. denied,* 476 U.S. 1151, 106 S.Ct. 2265, 90 L.Ed.2d 710 (1985), however, the Fifth Circuit found several of the *Baker v. Carr* circumstances to be present in a taxpayers association's origination clause challenge to the Tax Equity and Fiscal Responsibility Act of 1982, 96 Stat. 324 ("TEFRA"). That particular challenge concerned a specific identified ambiguity in the phrase "bills for raising revenue." The association wished to restrict its application to bills that "increase" revenue, while the government argued that the phrase encompasses all bills "relating to" revenue. The resolution of this ambiguity would have determined whether TEFRA survived or succumbed to the origination clause challenge. The court, however, declined to review *de novo* the interpretation it believed Congress had already given the phrase, holding that:

where ... a constitutional provision governing the mode of internal operation of Congress contains a word or phrase susceptible of more than one meaning, and Congress has given that word or phrase an interpretation consistent with the limitations on authority contained in the provisions, the courts should not intrude into the deliberative processes of Congress to modify that judgment. Such an inquiry poses a nonjusticiable political question.

*Texas Assoc.,* 772 F.2d at 167.

Newman does not ask us to resolve an ambiguity in the operative language of the origination clause, or to subvert a fixed meaning that Congress has placed on it. We are asked, rather, to decide if § 3013 is *in fact* a revenue bill, and there is no reason to think that offering a particular answer to this question will either presuppose a commitment to some controversial interpretation of the origination clause or usurp a Congressional prerogative to endorse one. The controversy surrounding this question does not concern the meaning to be attached to the clause; it instead concerns what the language and legislative history of § 3013 reveal about the statute's status as a "revenue bill" under an agreed-upon construction of that term. Even *United States v. Munoz–Flores,* 863 F.2d 654 (9th Cir.1988), the case on which Newman relies in arguing that § 3013 is unconstitutional and the only case to so hold, does not advance a novel interpretation of the origination clause. It merely fastens on a particular provision of § 3013 that, it believes, betrays the bill's revenue-generating character.

The list of six circumstances under which a case, according to *Baker v. Carr,* presents a non-justiciable political question is grounded on a respect for the separation of powers and a corollary concern that courts not engage in the brand of policy evaluation traditionally reserved to other

branches of government. We find that none of the *Baker v. Carr* circumstances is present in the instant appeal. We are asked to determine if § 3013 is a revenue bill and, if so, whether it originated in the House of Representatives. The first determination involves an inquiry into the language and purpose of the statute, as informed by discoverable legislative history, of the sort that courts undertake regularly under the name "statutory interpretation." The attempt at such interpretation here neither offends a commitment to separation of powers nor presupposes a policy commitment of any type. Neither should we concern ourselves at this stage with the possible political consequences of the conclusions we reach. As the Supreme Court wrote in *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1985): "One of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." The second determination, which because of our answer to the first we do not reach, involves a straightforward empirical inquiry into the genesis of § 3013, and as such is consistent with this Court's legitimate fact-finding function. As readers of legislative history, courts are peculiarly equipped to discover such matters, in the course of which process they need not evince any particular normative opinion. Newman's challenge, in sum, presents a justiciable issue with which this Court may properly deal.

*Is § 3013 a Revenue Bill?*

The special assessment provision Newman attacks provides:

§ 3013. Special assessment on convicted persons

(a) The court shall assess on any person convicted of an offense against the United States—

(1) in the case of a misdemeanor—

(A) the amount of $25 if the defendant is an individual; and

(B) the amount of $100 if the defendant is a person other than an individual; and

(2) in the case of a felony—

(A) the amount of $50 if the defendant is an individual; and

(B) the amount of $200 if the defendant is a person other than an individual.

(b) Such amount so assessed shall be collected in the manner that fines are collected in criminal cases.

(c) The obligation to pay an assessment ceases five years after the date of the judgment.

(d) For the purposes of this section, an offense under section 13 of this title is an offense against the United States.

18 U.S.C. § 3013 (1989).

The Comprehensive Crime Control Act included the Victims of Crime Act (codified at 42 U.S.C. §§ 10601–10605 (1989)). This Act established a Crime Victims Fund (the "Fund"), which is funded by fines collected from persons convicted of federal crimes, the proceeds of forfeited appearance bonds and bail bonds, and penalty assessments collected under § 3013. 42 U.S.C. § 10601(b). The fund is administered by the Director of the Department of Justice Office for Victims of Crime, 42 U.S.C. § 10605, and is spent in grants to state and federal crime victim compensation programs, child abuse prevention treatment programs, and crime victim assistance programs (*e.g.*, crisis intervention programs, emergency transportation, child care, housing and security.) 42 U.S.C. § 10601(d).

The statute provides that, if the total deposited in the Fund during a particular fiscal year reaches the statutory ceiling ($125 million through FY 1991; and $150 million thereafter through FY 1994).

the excess over the ceiling sum shall not be part of the Fund. The first $2,200,000 of such excess shall be available to the judicial branch for administrative costs to carry out the functions of the judicial branch under sections 3611 and 3612 of Title 18 and the remaining excess shall be deposited in the general fund of the Treasury.

42 U.S.C. § 10601(c)(1) (1989). The statute also provides that no deposits shall be

98

made in the Fund after September 30, 1994. 42 U.S.C. § 10601(c)(2) (1989).

 Section 3013 is vulnerable to an origination clause challenge only if it was intended to raise revenue "to be applied in meeting the expenses or obligations of the government generally." *Millard v. Roberts*, 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906). Only if the *primary purpose* of a bill is to raise revenue must it originate in the House of Representatives. *See Twin City National Bank v. Nebeker*, 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1894) (not every bill that contains a provision for the payment of dues, license fees, or special taxes is a "revenue bill"; if a bill generates revenue "as an incident to the main object" it is not a revenue bill); *United States v. Norton*, 91 U.S. 566, 23 L.Ed. 454 (1876) (origination clause has been confined to bills that levy taxes in the strict sense of the word and has not been understood to extend to bills having other purposes but which incidentally create revenue); *State of South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983) (a bill is not subject to origination clause challenge if its "primary purpose" is a goal other than the raising of revenue). Indeed, unless the raising of revenue appears *unequivocally* to be the primary purpose of § 3013, this Court should be reluctant to characterize the statute as a revenue bill. "A statute ... is to be construed, if such a construction is fairly possible, to avoid raising doubt of its constitutionality." *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981).

 The Ninth Circuit in *United States v. Munoz–Flores*, 863 F.2d 654 (9th Cir. 1988), was the first court of appeal to address the question of whether § 3013 is a revenue bill. The decision has apparently spawned the same type of challenge in the Fifth Circuit and federal district courts in Illinois, Minnesota, New York, and Pennsylvania.[4] The Ninth Circuit case involved defendant-appellant Munoz–Flores, who was convicted of two counts of aiding and abetting an alien to elude examination and

inspection. Munoz–Flores was sentenced to two years unsupervised probation and ordered to pay special assessments of $25 for each count, pursuant to § 3013. Munoz–Flores moved to correct this sentence pursuant to Federal Rule of Criminal Procedure 35(a), asserting that the special assessments were invalid because the legislation authorizing them originated in the Senate. The district court referred this matter to the magistrate, who denied the motion, finding the assessment constitutional. The district court affirmed, and Munoz appealed.

The court of appeals found § 3013 to be a revenue bill within the meaning of the clause. Asking whether § 3013 was passed for the purpose of raising revenue, or whether it only incidentally created revenue, the court found the language of the statute and the Victims of Crime Act to be ambiguous. It therefore turned to the report of the Senate Committee on the Judiciary, which stated in part:

> The purpose of imposing nominal assessment fees is to generate needed income to offset the cost of the [victims assistance fund] authorized under S. 2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program *and will constitute new income for the Federal government.*

S.Rep. No. 497, 98th Cong., 2d Sess., 13–14 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3607, 3619–20 [hereinafter Senate Rep. No. 497] [emphasis supplied by the court of appeals].

The Ninth Circuit's reasoning in *Munoz–Flores* has been rejected by this Circuit and by the three district courts which have considered origination clause challenges to § 3013. *See United States v. Ashburn*, 884 F.2d 901 (6th Cir.1989); *United States v. Greene*, 709 F.Supp. 636 (E.D.Pa.1989) (finding *Munoz–Flores* "unpersuasive" and that § 3013 is not a revenue bill, as its primary purpose is to assist victims of crime; its potential for raising general revenues above the Fund ceiling is incidental

---

4. These cases are discussed *infra* at pp. 98–99.

to its primary purpose); *United States v. Clark*, 717 F.Supp. 736 (S.D.N.Y.1989) (concluding that § 3013 did not originate in the Senate, but that Senator Thurmond's amendment was taken from House legislation passed the year before); *United States v. Hinkson*, No. 88 Cr. 945, 1989 WL 28469 (S.D.N.Y. March 22, 1989) (LEXIS, Genfed Library, District File) (upholding § 3013 as not a revenue bill, but legislation with the primary purpose of punishing convicted criminals); *United States v. Michaels*, 706 F.Supp. 699 (D.Minn.1989) (upholding § 3013 as "an integral part of a legislative scheme to aid victims of crime," and therefore not a revenue bill); *United States v. McDonough*, 706 F.Supp. 692 (D.Minn.1989) (upholding § 3013 as having the primary purpose of aiding victims of crime and therefore not a revenue bill); *United States v. Hines*, No. 88 Cr. 739, 1989 WL 16565 (S.D.N.Y. February 23, 1989) (LEXIS, Genfed Library, District File) (finding the Ninth Circuit's logic to be "obscure", as relying on "two snatches of legislative history," and § 3013 not to be a revenue bill).[5]

The above district courts have relied upon the same published opinion the Ninth Circuit rejected—*United States v. Ramos*, 624 F.Supp. 970 (S.D.N.Y.1985). There, the district court assumed that § 3013 originated in the Senate, but found that the special assessment was penal in nature, and that "[t]he fact that it also raises revenue is only incidental to the punishment." *Id.* at 973. That the Congress provided for the disposition of money that might be collected above the statutory ceiling did not according to the *Ramos* court, render the bill a revenue raising measure. The special assessment, moreover, was held not to be a tax on the public but only a consequence of being convicted of a crime. The court noted that the special assessments were levied like criminal fines, increasing with the severity of the crime and apportioned per count. *Id.*

This Court is not persuaded by this and other opinions holding the special assessment to be a penalty. It need not find that the assessment *is* a penalty, however, in order to find that it is *not* a revenue bill.

Although, as the *Munoz–Flores* court conceded, "only small amounts [of revenue] would be collected by the assessments," 863 F.2d at 659, the court felt that that portion of § 3013's legislative history contemplating "new income for the Federal government" evidenced a Congressional hope and intent to gain general federal revenue. Even it believed, however, that "the bill might well have passed constitutional muster" had that language been omitted and the funds been limited to victim assistance programs. *Id.* at 658.

We do not attach the same significance or weight to the relied-upon language, which we find to be among the myriad "snatches of legislative history" on which *Hines* accuses the *Munoz–Flores* court of having relied. Nor do we detect in 42 U.S.C. § 10601's provision that funds exceeding $125 million "shall be deposited in the general fund of the Treasury" a Congressional intent to raise general federal revenue. This directive provides, clearly, only for a contingency: *should* § 3013 generate excess funds, *then* they will be deposited in the general fund. It does not evidence an *expectation* on the part of Congress that the contingency will be realized. The expectation, indeed, appears to be the opposite: revenues from § 3013 were, in 1984, projected to amount to only $45 to $75 million annually. *See* 1984 U.S.Code Cong. & Admin.News at 3627. Any amounts over $125 million would in any event be a very small percentage of the total revenue generated.

It is, then, clear to this Court that, even if § 3013 was expected to generate some general federal revenue, this was not its *primary purpose*.[6] As such, we find that

---

**5.** Origination clause challenges have been raised in two other courts, but the arguments were raised too late and deemed to be waived. *See United States v. Desurra*, 868 F.2d 716 (5th Cir. 1989); *United States v. Heckler–Sollanek*, No. 87

Cr. 513, 1989 WL 31025 (N.D.Ill.1989) (LEXIS, Genfed Library, District File).

**6.** If the raising of general federal revenue were the bill's primary purpose, then one might expect exactly the opposite of what in fact the bill

§ 3013 is not a revenue bill. *See Twin City National Bank v. Nebeker,* 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897). As we read *Munoz–Flores,* moreover, there is nothing the Ninth Circuit should find *essentially* uncongenial about this holding. The "conflict" we here create does not concern the interpretation of the origination clause or involve some fundamental disagreement about the history and purposes of § 3013. It is, rather, merely a question of the significance to be attached to certain snippets of legislative history that seem to contemplate § 3013's raising general federal revenue. We agree with the Ninth Circuit's conditional premise that, if the revenue from § 3013 is to be used to fund victim assistance programs, then the statute is not a revenue bill in the relevant sense. 863 F.2d at 658. We, unlike the Ninth Circuit, merely find that the antecedent is true, i.e., that such revenue *is* to be used (at least primarily) to fund those programs.

Because we find that § 3013 is not a revenue bill, Newman's origination clause challenge must fail. It is not necessary to inquire whether § 3013 originated in the House or in the Senate. We accordingly uphold the district court's imposition of the $100 special assessment.

## VI.

For the reasons stated above, this Court overrules each of Newman's four assignments of error. Newman's conviction is hereby AFFIRMED.

provides. One might expect, that is, that the revenue generated initially would be deposited in the first instance into the general fund of the Treasury, with any amounts in excess of $125 million being used to fund victims assistance programs.