On Petition for Rehearing En Banc

ORDER

Appellant’s petition for rehearing en banc, the response thereto, and the briefs of amici curiae in support of appellant were circulated to the full court, and a vote was requested. Thereafter a majority of the judges of the court in regular, active service did not vote in favor of the petition. Upon consideration of the foregoing, it is ORDERED that the petition be denied.
A statement by Circuit Judges ROGERS, PILLARD, and WILKINS, concurring in the denial of rehearing en banc, is attached.
A statement by Circuit Judge KAVANAUGH, with whom Circuit Judges HENDERSON, BROWN, and GRIFFITH join, dissenting from the denial of rehearing en banc, is attached.
ROGERS, PILLARD, AND WILKINS, Circuit Judges,
concurring in the denial of rehearing en banc:
A majority of the court has voted to deny the petition for en banc rehearing of this case. A dissenting statement, however, charges the original panel opinion with undermining individual liberty by upsetting the balance of power between the two Houses of Congress. See Dissent at 1064-65. Our opinion does no such thing.
Our examination of the Origination Clause’s text and history, as well as congressional practice and Supreme Court precedent related to the Clause, persuaded us that the clearest and narrowest ground on which to resolve Sissel’s challenge to the payment required under section 5000A of the Affordable Care Act, 26 U.S.C. § 5000A, was to rely on the Supreme Court’s established purposive approach. The Court recognized in National Federation of Independent Business (NFIB) v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2596, 183 L.Ed.2d 450 (2012), that, “[a]l-though the [section 5000A] payment will raise considerable revenue [if people do not ‘sign up’], it is plainly designed to expand health insurance coverage,” acknowledging that the purpose of the Affordable Care Act (“ACA”) and its tax penalty was to spur conduct, not to raise *1036 revenue for the general operations of government.
Doctrinal and prudential reasons counseled against relying on the alternative ground that the dissent proposes the en banc court adopt. Among other things, the panel’s narrow course avoided more categorical and less historically rooted holdings that the dissent’s approach would require: (1) that all bills containing tax provisions that do not designate the funds raised for use by a specified government program implicate the Origination Clause, and (2) that the Senate may amend House-originated revenue bills without limit. The former is contrary to the best reading of governing law, which does not support application of the Origination Clause to legislation like the ACA. The latter may be contrary to congressional practice or, relatedly, be perceived as judicial endorsement of treating the Origination Clause as empty formalism. The panel found no reason to tread on such infirm ground. The dissent disagrees, and in doing so occasions this response.
The dissent misreads the Supreme Court’s Origination Clause precedent. The novel approach proposed by the dissent — exempting bills that levy taxes from the Origination Clause where they designate the funds for exclusive use by a particular government program — is also flawed for a number of other reasons. Textuálly, the dissent asserts that the Origination Clause “unmistakably embraces all bills that are intended to raise revenue.” Dissent at 1055. The dissent provides no satisfying explanation why bills that raise revenue designated for expenditure only on specified programs — and only such bills — are outside the Clause, nor how the Clause’s text forecloses the panel’s interpretation. See Dissent at 1055, 1057-59. The dissent’s analysis of congressional practice suffers from the same defect. The House of Representatives has at times interpreted the Clause more broadly than does the Supreme Court, the panel, or the dissent, and it retains the prerogative to do so. The dissent’s discussion of the history of the Constitution’s ratification as relevant to the Origination Clause analysis omits essential context that undercuts the dissent’s conclusions. See Dissent at 1055-57, 1061-62. We take up the dissent’s principal concerns below.
I.
The panel opinion rests, as it must, on binding Supreme Court precedent. The Supreme Court has never found an Origination Clause violation. And, in three separate cases spanning more than a century, it held that the variable controlling whether a statutory provision falls within the ambit of the Origination Clause is whether raising revenue for the general Treasury is that provision’s primary purpose. See United States v. Munoz-Flores, 495 U.S. 885, 899, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990); see also Twin City Nat’l Bank v. Nebeker, 167 U.S. 196, 203, 17 S.Ct. 766, 42 L.Ed. 134 (1897); Millard v. Roberts, 202 U.S. 429, 436-37, 26 S.Ct. 674, 50 L.Ed. 1090 (1906). The panel opinion rests on the purposive reading adopted and applied by the Supreme Court in these three cases.
A.
Munoz-Flores, the Supreme Court’s most recent pronouncement on the Origination Clause, restated that “a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a Bill for raising Revenue within the meaning of the Origination Clause.” 495 U.S. at 398, 110 S.Ct. 1964 (internal quotation marks and brackets omitted). *1037 The dissent quotes that language, but then adds a new and different test by which a statute could escape the requirements of the Origination Clause only if it raises funds “designated for use in a specific program,” and does not “raise revenues paid into the general treasury and available for general governmental use[ ].” Dissent at 1057. The Court in Munoz-Flores, however, described and followed Nebeker ’s holding that “a bill creating a discrete governmental program and providing sources for its financial support is not a revenue bill simply because it creates revenue.” 495 U.S. at 400, 110 S.Ct. 1964. The Court could have been talking about the ACA.
The dissent nonetheless argues that this court should convene en bane to announce that the holdings in Munoz-Flores, Millard, and Nebeker are narrower than the purposive test expressly employed by the Supreme Court. Those cases, the dissent contends, establish only a very limited exception to the Origination Clause for taxes designated exclusively for use by a specific program or service. Dissent at 1057-59. That argument relies on a faulty premise. The cases considered by the Supreme Court involved revenue-generating measures that supported identified government programs or services but that were not designated by law for exclusive use by the particular program or service, and in any event none of them was resolved on the grounds proposed by the dissent.
Munoz-Flores concerned a challenge to a law imposing a “special assessment” on any person convicted of a federal misdemeanor, with the proceeds up to a threshold amount deposited into a Crime Victims Fund, and any surplus beyond the threshold deposited into the general fund. 495 U.S. at 398-99, 110 S.Ct. 1964. The dissent observes that “[t]he Court first swept [the general fund spillover] scenario aside as one that would rarely occur in practice.” Dissent at 1059. The Munoz-Flores Court did sweep that scenario aside, though it could do so only because it was engaged in an interpretation of the law’s “primary purpose” rather than because assessments paid would never go into general revenue. 495 U.S. at 399, 110 S.Ct. 1964; see also Minor and Technical Criminal Law Amendments Act of 1988, Pub.L. No. 100-690 § 7121, 102 Stat. 4419, 4422 (1988) (codified at 42 U.S.C. 10601(c)(1)(A) (1988)) (stating that if the Crime Victims Fund hits a specified ceiling in deposits in any given year, the excess “shall be deposited in the general fund of the Treasury.”). In fact, Munoz-Flores expressly acknowledged that some of the law’s proceeds already had gone to general revenue. 495 U.S. at 399, 110 S.Ct. 1964. The case cannot support the dissent’s bright-line test.[1]
Nebeker involved three bank taxes in Section 41 of the National Bank Act of 1864, ch. 106, 13 Stat. 99, 111 (1864), that allegedly originated in the Senate. Nebek *1038 er, 167 U.S. at 202-03, 17 S.Ct. 766. The taxes, due every six months, required that each bank pay a half percent tax on the “average amount of its notes in circulation,” a quarter percent tax on the “average amount of its deposits,” and a quarter percent tax on the “average amount of its capital stock beyond the amount invested in United States bonds.” Id. at 199, 17 S.Ct. 766 (quoting 13 Stat. at 111). The principal purpose of the National Bank Act was “to provide a national currency based upon United States bonds,” id. at 203, 17 S.Ct. 766, and the Act provided that the expenses of the Office of the Comptroller of the Currency would be paid from the taxes in the Act, see id. at 199-200, 17 S.Ct. 766. But it is not the case, as the dissent asserts, that “all of the funds raised were designated by law to be used to pay the costs of printing and distributing currency.” Dissent at 1058.
The Act at issue in Nebeker placed no restriction on how funds raised in excess of those needed for maintaining the currency would be spent. The taxes at issue in Nebeker were to be paid “to the treasurer of the United States” “in lieu of all existing taxes.” 167 U.S. at 198-99, 17 S.Ct. 766 (quoting 13 Stat. at 111). The statute directed that the “expenses of the [currency] bureau” were to be paid from the money raised. Id. But, other than that requirement, the Act placed no limitation on the use of any excess funds. Id. As things turned out, there was a great deal of excess. The Secretary of the Treasury’s most recent annual report at the time the Supreme Court decided Nebeker reflected that $1,763 million had been collected in the first half of that year through the tax on national banks. Annual Report of the Secretary of the Treasury on the State of the Finances for the Year 1896, at XIX (GPO 1897). The Secretary recommended that the tax be cut in half. Id. at XXXIII. The Comptroller of the Currency’s own contemporaneous annual report explained that this was because the tax collected funds- “beyond any possible need of the Government.” Annual Report of the Comptroller of the Currency to the Second Session of the Fifty-Fourth Congress, at 105 (GPO 1896). When the new Federal Reserve System displaced national bank notes in 1914, and the Comptroller ultimately accounted for the life of the circulation tax, he reckoned that $126 million had been collected from the circulation tax alone while the expenses of the Currency Bureau had been only $15 million. 1 Annual Report of the Comptroller of the Currency to the Third Session of the Sixty-Third Congress, at 55 (GPO 1915). The circulation tax raised billions in today’s dollars. One could say — borrowing words used by today’s dissent — that the Bank Act “raise[d] revenue. Lots of revenue.” Dissent at 1049.
The Supreme Court nonetheless held in Nebeker that the taxes did not implicate the Origination Clause because they were “in the furtherance of [the] object” of the Act: “providing a national currency.” Nebeker, 167 U.S. at 202, 17 S.Ct. 766. The Court said it was conclusive that:
[t]he main purpose that congress had in view [in enacting the National Bank Act] was to provide a national currency based upon United States bonds, and to that end it was deemed wise to impose the tax in question. The tax was a means for effectually accomplishing the great object of giving to the people a currency that would rest primarily upon the hon- or of the United States, and be available in every part of the country. There was no purpose by the act, or by any of its provisions, to raise revenue to be applied in meeting the expenses or obligations of the government.
Id. at 203, 17 S.Ct. 766 (emphasis added). The taxes in Nebeker had the effect of raising substantial general revenues, but *1039 that was not the purpose — the “great object” — of the law, and so the Origination Clause was not implicated. See, e.g., 1 Westel Woodbury Willoughby, The Constitutional Law of the United States § 251, p. 566 (1910) (“[I]n [Nebeker] the court, in effect, held that a bill, the primary purpose of which is not the raising of revenue, is not a measure that must originate in the House, even though, incidentally, a revenue will be derived by the United States from its execution.”).
Similarly, in Millard, the Supreme Court held that three laws relating to railroad improvements and expansion in the District of Columbia did not implicate the Origination Clause. 202 U.S. at 434-35, 26 S.Ct. 674. One of the laws at issue provided, in relevant part, that the costs of making the improvements the Act contemplated would be paid “[fjifty per centum ... by the United States and the remaining fifty per centum ... by the District of Columbia, which last-mentioned fifty per centum shall be levied and assessed upon the taxable property and privileges in said District other than the property of the United States and of the District of Columbia.” 31 Stat. 767, 771, 773-74 (1901). The other two statutes also provided that “half’ of the costs of various sorts of improvements would “be paid out of the revenues of the District of Columbia,” 31 Stat. 774, 779 (1901), or “by the District of Columbia,” 32 Stat. 909, 918 (1903). The case is frequently described as imposing “a tax on property in the District of Columbia.” Dissent at 1058. As the statutory language appears to show, however, the three laws challenged in Millard did not in themselves specify or levy taxes.
The Millard v. Roberts court of appeals thought the appellant charged the Senate with unconstitutionally originating an appropriations bill. 25 App.D.C. 221, 223-24 (1905), aff'd, 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906). It disposed of the case on the ground that sustaining a challenge to “a bill plainly for another purpose, and which only incidentally carries an appropriation with it in order to give it effect” would mean that “possibly one half or three fourths of the legislation of Congress would be null and void.” Id.
The Supreme Court in Millard took a different tack, calling the bill a tax but summarily rejecting the appellant’s claim. The Court held that whether the challenged bill anticipated future taxes or somehow levied taxes did not matter, because “[wjhatever taxes are imposed are but means to the purposes provided by the act.” 202 U.S. at 437, 26 S.Ct. 674. The taxes were instrumental to the accomplishment of the statutory purpose — railroad improvements. The Court thus thought the challenge easily dismissed: “In answer to the [Origination Clause] contention the case of [Nebeker ] need only be cited.” Id.
Millard’s brevity offers an important clue in unpacking the Supreme Court’s adherence to a purposive approach to the Origination Clause. The Court thought the issue so clear-cut in Millard that it dismissed the case on purpose grounds rather than on the ground that the statute simply did not impose any taxes (but at most described future taxes). Were designation truly the test of the Origination Clause’s scope, Millard would have been a far more difficult case. Millard might or might not have involved designation; it might or might not have reviewed a bill levying new taxes. The Court in Millard did not dismiss the case because the bill under review imposed no tax, nor because the taxes were in any way explicitly designated, but because the taxes were “but means to the purposes provided by the act.” 202 U.S. at 437, 26 S.Ct. 674. Under that analysis, the ACA readily survives Sissel’s Origination Clause challenge.
*1040 B.
The purpose of the ACA was to overhaul the national healthcare system, not to raise revenue. It provided for a “shared responsibility payment,” 26 U.S.C. § 5000A, to support the law’s programmatic goals by encouraging people to purchase insurance and by helping to fund the overall program. See NFIB v. Sebelius, 132 S.Ct. at 2585 (describing the mechanics of the shared responsibility payment as the solution to cost-shifting problems in the national health insurance market).
The ACA enacted that mandate as part of three key reforms in the national health insurance market. The Act (1) bars insurers from denying coverage to any person because of a preexisting condition (a reform called “guaranteed issue”) and prohibits charging people with preexisting conditions higher premiums than those without (a reform called “community rating”), (2) enacts market-expanding reforms to ensure large enough risk pools through a “coverage mandate” to prevent health insurance premiums from skyrocketing, and (3) provides refundable tax credits to individuals in order to make insurance more affordable. See King v. Burwell, — U.S. -, 135 S.Ct. 2480, 2486-87, 192 L.Ed.2d 483 (2015). The centerpiece of the market-expanding reforms is a requirement that individuals purchase insurance, supported in part by the tax subsidies where needed. See id. A mandate that people lacking insurance pay to the government a “shared responsibility payment” is designed to encourage individuals to buy coverage.
As the Supreme Court emphasized in its recent King v. Burwell opinion interpreting a key provision of the ACA, that law’s “three key reforms” are “closely intertwined.” Id. at 2487. The Court explained that “[a] fair reading of legislation demands a fair understanding of the legislative plan” and Congress’s legislative plan in passing the ACA was to “improve health insurance markets” by making coverage more accessible and affordable. Id. at 2496. King reinforces the Supreme Court’s holding in NFIB, and the panel’s conclusion in this case, that the individual mandate is part of a package of reforms Congress deemed essential to the ACA’s main purposes of “expanding] coverage in the individual health insurance market” and “ensur[ing] that anyone who wanted to buy health insurance could do so.” Id. at 2485.
The dissent objects that the shared responsibility payment will raise too much money for it to count as just a piece of a larger, more comprehensive whole.[2] The dissent forefronts the size of the numbers involved, highlighting one early Congressional Budget Office estimate of the billions of dollars the ACA would raise over ten years. Dissent at 1049, 1052-53. It is unclear what those numbers could add to the claim that the ACA raises revenue; they are gross figures, not net of the costs of providing the health insurance coverage and health care for which the ACA was enacted. Any time Congress enacts an ambitious, nationwide reform that includes a mechanism to pay for itself, the numbers will be large. But program size does not establish a revenue-raising purpose- or effect. The purpose of the ACA is to give back what it generates, in the form of broader, more effective, and fairer health coverage, not to raise revenue for general governmental obligations.
*1041 The dissent does not contend that the purpose of the ACA or its shared responsibility payment was to raise revenue. Id. The dissent nonetheless points out that there are taxes in the ACA other than the shared responsibility payment. Id. But only the shared responsibility payment was alleged as the basis for the Origination Clause claim in this case.[3] In any event, the dissent’s examples of Senate-originated laws that should implicate the Origination Clause all involve Senate bills with tax provisions that are unrelated to the purposes of the bill or have revenue-raising as the Senate’s sole purpose. Id. at 1053-54, 1058-59. The dissent mentions, for example, that the Senate might attempt to attach a gas tax to a major national security bill, id. at 1053-54, or raise income taxes to offset the costs of fighting a war, id. at 1058-59. The panel opinion does not, and need not, opine on how the Origination Clause might apply to a bill containing revenue-raising provisions unrelated to its non-revenue objectives.
The dissent does not contend, nor are we aware of any credible suggestion, that the purpose of the ACA, including its revenue provisions, was other than to reform the nation’s market for health care, including by encouraging individuals to purchase health insurance and by supplying subsidies to make those purchases affordable. Sissel has not identified any provision in the ACA that he asserts is unrelated to its overarching purpose. This is not a case in which the Senate originated an omnibus bill packed with revenue provisions bearing no apparent relationship to any other aspect of the bill. Whatever novel questions such a bill would raise, they are far afield from this case, which is easily decided under the Supreme Court’s precedents.
The dissent skillfully strives to square its view of the Origination Clause with the Supreme Court’s precedents. Its basic position is that “any provision” of a law that raises revenue for general governmental purposes comes within the Origination Clause. Id. at 1060 n. 5. It quickly acknowledges that rule is too broad. Acts to sell public lands, trade bills, and laws that fix the price of stamps, among many others, have always fallen outside the Clause. So have several types of laws that actually levy taxes. To align its rule with precedent, the dissent defines an exception to the general rule: laws creating distinct governmental programs fall outside the Clause, but only if they designate the money they raise for a separate fund to pay their costs. Id. at 1057-59. The dissent sees that even that rule still sweeps too wide. The Supreme Court has held at least twice that laws that paid into the general Treasury fell outside the Clause. To make it work, the dissent locates another exception: Laws that do not raise “substantial” revenue for the Treasury are also not subject to the Clause. Id. at 1058-60.
Those rules and their exceptions do not reflect the law. The dissent insists that it must matter to the Constitution whether a bill expressly designates its revenues for use by a particular government program. No case has ever said that it must. The Court has instead cautioned that “[wjhat bills belong to that class [of bills for raising revenue] is a question of such magnitude and importance that it is the part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject.” Nebeker, 167 U.S. at 202, 17 S.Ct. 766. The dissent yearns for just *1042 such a general statement. But there is no need for one in this case.
It bears repeating that, in all of our history, the Supreme Court has not once found a law in violation of the Origination Clause. The Court has said Origination Clause challenges are justiciable, and the panel’s opinion stayed in the lane in which the Court has authorized judicial review.
II.
In deciding this case, the panel saw no need to go further than application of the relevant Supreme Court precedent. Our court exercises its en banc power sparingly; its exercise of that power to change the reasoning in correctly decided cases is rarer still. We think the dissent, in arguing for rehearing now, seeks to revisit Origination Clause doctrine in ways squarely foreclosed by that precedent and unsupported by the Constitution’s history and text. Even setting aside that these are not open issues, we see problems with the dissent’s treatment of several of them, which we address in turn.
A.
First, the dissent would reach the same conclusion that the Court did on a different basis. It reasons that H.R. 3590, the legislative vehicle that became the Affordable Care Act, was a revenue-raising bill that originated in the House. Dissent at 1050, 1060-63 & n. 6. To get there, it rests on Rainey v. United States for the proposition that, as long as a Senate amendment is “an amendment to a bill for raising revenue which originated in the House[,][t]hat is sufficient” for it to comply with the Origination Clause. 232 U.S. 310, 317, 34 S.Ct. 429, 58 L.Ed. 617 (1914). Rainey, the dissent tells us, “is squarely on point and has never been overruled.” Dissent at 1063.
If there was no reason to doubt that approach, we agree that it could be a ready, additional way to decide this case, either in the first instance or as an alternative' holding. But we decided against relying on it, in large part because the holding of Munoz-Flores — the Supreme Court’s most recent examination of the issue — was based on a different analysis. The Court chose its approach over an alternative developed in Justice Scalia’s passionate concurrence in the judgment, which would have decided that case as the dissent proposes to approach this one. See 495 U.S. at 391-92 & n. 4, 110 S.Ct. 1964; id. at 408, 110 S.Ct. 1964 (Sealia, J., concurring in the judgment). Quite simply, Munoz-Flores insisted on basing the holding upon the purpose of the bill rather than the chamber where the bill began, and because the Court’s latest analysis of the Origination Clause is instructive (if not binding), we believe the proper course is to follow that example.
We ultimately decided not to address the scope of the Senate’s power to amend House-originated Bills because Munoz-Flores and the Supreme Court’s other cases delineating the scope of the Origination Clause provided a clear path to the proper resolution of Sissel’s contention.
B.
The dissent also contends that the text of the Origination Clause forecloses the approach that the Supreme Court has used for more than a century and that we applied in this case. Instead, the dissent states: “If any provision of the law raises revenue for general governmental purposes, then the Origination Clause applies.” Dissent at 1060 n. 5. It explains:
The text of the Clause does not exempt bills that also accomplish other objectives or serve other predominant purposes. As long as the bill raises reve *1043 nue, the text of the Clause requires that the bill originate in the House.
Id. at 1055.
To the contrary, the text of the Origination Clause supports the Supreme Court’s purposive approach. The text of the Clause provides that:
All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.
U.S. Const, art. I, § 7, cl. 1. The Clause’s critical word for this analysis is “for.” The word “for” in this context means “with the purpose or object of.” See Webster’s Third New International Dictionary of the English Language 886 (1981); see also Samuel Johnson, A Dictionary of the English Language 353 (10th ed. 1792) (defining the word “for” as meaning, among other things, “with intention of’).
The text of the Origination Clause supports the purposive reading reflected in the Supreme Court’s decisions. The dissent’s textual analysis ignores that the word “for” applies to the purpose of a “Bill,” not to any single provision of it. The grammatical reading of the text of the Origination Clause is that it only reaches bills that have raising revenue as their purpose or object. If it were meant to apply to all bills that raised revenue, the Origination Clause would read “All Bills that raise Revenue” shall originate in the House. The purposive reading of the Origination Clause’s text also aligns the Clause’s textual meaning with the Supreme Court’s precedents, which have consistently held that bills whose primary purpose is to raise revenue must originate in the House, while all other bills may originate anywhere.
In contrast, if the dissent is right about what the Clause’s about it. The dissent admits that. Dissent at 1059-60. As the dissent explains: “[S]ome might say that the Nebeker-Millard-Munoz-Flores line of cases” are “inconsistent with the constitutional text because the laws in those cases did raise money, even though the money was designated by law for specific programs.” Id. The dissent says there is a “straightforward” explanation for that seemingly fatal incongruity: In Nebeker, Millard, and Munoz-Flores the Court carved out “narrow” exceptions to the Clause’s text for “compelling” reasons supported by “history.” Id. at 1059-60. As discussed above, the Supreme Court’s decisions are better read as consistent with the Constitution’s text.
C.
The dissent points out that the House has “blue-slipp[ed]” revenue-raising bills with regulatory purposes. Id. at 1056. But the House has interpreted the Origination Clause far more broadly than even the dissent believes is appropriate. The practice of the House supports neither the panel nor the dissent — its method differs from both. The House of Representatives has charted its own path. That is its prerogative. It does little to clarify the question now before us.
The House has cited the Origination Clause in returning to the Senate bills that appropriate funds, see 3 Lewis Deschler, Deschler’s Precedents of the United States House of Representatives ch. 13, §§ 20.2, 20.4 (1994), ban certain imports, see 138 Cong. Rec. 3377 (Feb. 25, 1992); 145 Cong. Rec. H5677-80 (July 15, 1999), adjust import quotas, see Deschler’s Precedents ch. 13, § 15.4, and that reduce revenue by granting tax exemptions, see id., §§ 15.3, 18.5. Recently, the House blue-slipped a Senate bill that would have repealed a fee whose proceeds, like those in Munoz-Flores and Nebeker, were designated to pay for a particular nuclear waste disposal program and were deposited into the general fund of the Treasury only after they *1044 exceeded the cost of the program. See 144 Cong. Rec. H878-79 (Mar. 5,1998).
The House thus has considered the Clause to apply well beyond the lines drawn by the Supreme Court, the panel in this case, and the dissent. The House may well continue to do so, and it retains the means by which to enforce its own interpretation of the Clause. But, as a result, its practice does not provide support for the dissent’s designation approach.
D.
The dissent claims that the Origination Clause “reflects a deliberate choice made by the Framers at Philadelphia.” Dissent at 1055. It cites the views of two individual Framers and declares they “might as well have been speaking about the Affordable Care Act.” Id. The Constitution certainly reflects deliberate choices, but it is not at all clear that the dissent has correctly analyzed the choices reflected in the Origination Clause. The historical evidence best supports the Supreme Court’s purposive interpretation.
What began as a requirement that “all money bills of every kind shall originate in the House of Delegates & shall not be altered by the Senate” eventually evolved into the relatively limited prohibition on Senate origination of bills for raising revenue that we have today. See Thomas L. Jipping, TEFRA and the Origination Clause: Taking the Oath Seriously, 35 BUFF. L. REV. 633, 661-62 & n. 146 (1986). The scope of the Origination Clause “underwent a narrowing of focus from concerning ‘all money bills’ to ‘bills for raising revenue’ through the course of the [constitutional] convention.” Id. at 662. The narrowing was consequential: “Successive versions of the clause show that the specific powers contained in its original version were given up only when it was clear that success of the convention required it.” Id. at 661.
There is weighty evidence the Clause’s use of the phrase “for raising revenue” was meant to establish a purposive standard. On two occasions near the end of the Constitutional Convention, supporters of the Clause proposed language that expressly limited its reach to bills enacted for the purposes of raising revenue. See 2 The Records of the Federal Convention of 1787, at 294-97, 266-80 (Max Farrand ed., 1911) (hereinafter Farrand’s Records). Opponents of the Clause expressed no opposition to its narrowing, but focused their criticisms on the absence of a Senate amendment power and the Clause’s prohibition on Senate appropriations. See, e.g., id. at 224, 274-80. That history suggests that the Origination Clause’s “All Bills for raising Revenue” language was meant to condense the purposive language put forward by the Clause’s proponents near the close of the Convention — “for the purposes of revenue” — but not to change its meaning.
The Constitutional Convention’s critical compromises concerning the language and scope of the Origination Clause occurred in its closing weeks, between mid-August and early September 1787. As of mid-August, proponents of the initial, broader version of the Origination Clause were on the defensive. On August 6, the Committee of Detail — of which Edmund Randolph, a strong supporter of the Origination Clause, was a prominent member — put forward its draft proposal for the Constitution. That draft included the language: “All bills for raising or appropriating money ... shall originate in the House of Representatives, and shall not be altered or amended by the Senate.” Id. at 178 (Aug. 6, 1787); see also William Ewald, The Committee of Detail, 28 CONST. COMMENT. 197 (2012) (describing circumstances surrounding the Committee of Detail’s draft).
*1045 Two days later, a coalition of delegates came together to strike the Clause from the draft of the Constitution, and succeeded in doing so by a vote of 7-4. 2 Far-rand’s Records at 210-11 (Aug. 7, 1787); id. at 214 (Aug. 8, 1787). The Clause’s opponents saw it as a needless landmine, one that could seriously weaken the new national government by investing too much power in what they viewed as the less independent, less expert, and less responsible of the two chambers of Congress, while generating pointless gridlock and mortally weakening the Senate. See, e.g., id. at 224 (Aug. 8, 1787) (summarizing objections of Pinkney, Mercer, and Madison, the last of whom “was for. striking it out: considering it as of no advantage to the large States as fettering the Govt, and as a source Of injurious altercations between the two Houses”); id. at 274-80 (Aug. 13, 1787) (summarizing additional objections of Wilson, Morris, Madison, Carrol, Rutledge, and McHenry to a similar version of the Origination Clause five days later).
The Origination Clause’s proponents, in an effort to resuscitate it, suggested circumscribed language that they hoped would reinstate its core. On August 11, Edmund Randolph successfully moved to have the Clause reconsidered:
[Randolph] signified that he should propose instead of the original Section, a clause specifying that the bills in question should be for the purpose of Revenue, in order to repel ye. objection agst. the extent of the words “raising money,” which might happen incidentally, and that the Senate should not so amend or alter as to increase or diminish the sum; in order to obviate the inconven- . iences urged agst. a restriction of the Senate to a simple affirmative or negative.
Id. at 263 (Aug. 11,1787). That motion for reconsideration passed by a vote of 9-1. Id. Randolph’s amended Origination Clause read:
[A]ll bills for raising money for the purposes of revenue, or for appropriating the same, shall originate in the House of representatives; and shall not be so altered or amended by the Senate, as to encrease or diminish the sum' to be raised, or change the mode of raising or the objects of [its] appropriation.
Id. at 266 (Aug. 13, 1787). Speaking in favor of the revised Origination Clause, George Mason explained that “[b]y specifying purposes of revenue, it obviated the objection that the Section extended to all bills under which money might incidentally arise.” Id. at 273 (Aug. 13, 1787) (emphasis in original).
Elbridge Gerry, probably the most ardent supporter of a stronger. Origination Clause, expressed displeasure with Randolph’s narrowing and indicated it conceded too much. In the debate over the new, narrower Origination Clause, Gerry cautioned: “[A]ceeptance of the plan will inevitably fail, if the Senate be not restrained from originating Money bills.” Id. at 275. After substantial debate, the Convention rejected Randolph’s amended language by a vote of 7-4. Id. at 266 (recording votes taken Aug. 13,1787).
James Madison also spoke in that exchange. Madison was against the inclusion of an Origination Clause. He had said only five days earlier, with respect to a prior, broader version that he “was for striking it out.” Id. at 224 (Aug. 8, 1787).
Madison explained that he thought Randolph’s amendments to the Clause did little to repair it. See id. at 276-77 (Aug. 13, 1787). Randolph’s suggested purposive language, he argued, would not prevent “contention & faction,” and it could create “difficulties and disputes between the two houses.” Id. at 276 (Aug. 13, 1787). Even if limiting purposive language were insert *1046 ed, the House could still insist that Senate-originated trade bills were actually disguised bills for raising revenue. See id. Randolph’s purposive language would not prevent the two Houses from clashing over which bills were subject to the Clause. See id. In Madison’s view, the purposive language was not enough of an improvement. See id. at 276-77.
The dissent leans on Madison’s remarks, but concludes they express views opposite to those Madison held. See Dissent at 1055-56. The dissent sees in Madison’s words a ringing rejection of a purposive Origination Clause, not just by Madison, but the whole Convention. Two flaws in that account are especially pertinent.
First, Madison opposed Randolph’s purposive language not because he favored a broader Clause (as the dissent implies) but because he opposed the Clause entirely, and thought the purposive language did not meaningfully narrow it. The dissent’s error is in thinking that Madison was against the language when in fact he was against the Clause, and thought the language too limited a fix to persuade him to support it. See Dissent at 1055-56 & nn. 3-4.
Second, the dissent overlooks that, whatever Madison thought, supporters of the Clause — those that most wanted it in the Constitution — thought that a purpose-based limitation was a compromise on which all sides could agree. The dissent pins its argument that the Convention rejected the purposive Origination Clause on two sentences by Madison. The dissent overlooks entirely that Madison thought a non-purposive Clause would be equally unworkable, 2 Farrand’s Records at 276-77 (Aug. 13, 1787); id. at 224 (Aug. 8, 1787), that discussion of the Origination Clause did not begin or end with Madison’s remarks, and that when its supporters regrouped and reintroduced the Clause thereafter, they left the purposive language intact.
Following the rejection of Randolph’s proposal on August 13, Caleb Strong moved on August 15 to introduce language substantially similar to Randolph’s, except that it also authorized the Senate to amend House-originated bills passed “for the purposes of revenue.” Id. at 294, 297. The revised language of the Origination Clause read:
Each House shall possess the right of originating all Bills except Bills for raising money for the purposes of revenue or for appropriating the same and for fixing the salaries of the Officers of Government which shall originate in the House of representatives; but the Senate may propose or concur with amendments as in other cases.
Id. at 294. The Convention postponed consideration of the motion to amend the relevant Section by a vote of 6-5. Id. On August 21 it again deferred consideration of the Amendment. Id. at 357-58.
On August 31, those parts of the draft Constitution that had been postponed were referred to a committee called the Committee of Eleven, composed of a Convention member from each state. See id. at 473, 481 (Aug. 31, 1787) (listing Committee members and purpose of the Committee). On September 5, the Committee reported out a version of the Origination Clause almost identical to the modern Clause. It included the important requirement that “all Bills for raising Revenue” would originate in the House of Representatives, along with language permitting the Senate to amend such bills. Id. at 505 (Sept. 5, 1787). The convention finalized the Clause three days later by slightly amending the language governing the Senate’s amendment authority. Id. at 552 (Sept. 8, 1787). The Convention settled on that language by a vote of 9-2, id., and signed the Con *1047 stitution nine days later, on September 17, 1787.
The final language of the Clause employs a word (“for”) that is widely recognized as a synonym for the words “for the purposes of’ — the very language the proponents of the narrowed substitute Clause had suggested. See id. at 263 (Aug. 11, 1787) (Randolph’s proposed language: “All bills for raising money for the purposes of revenue”); id. at 294 (Aug. 15, 1787) (Strong’s proposed language: “Bills for raising money for the purposes of revenue”). That evidence suggests that the Supreme Court’s purposive reading of the Origination Clause is the reading the Framers intended.
The dissent misses that substitution of the Constitution’s “for raising revenue” language for its “for raising money for the purposes of revenue” language occurred in a context making clear that it was a stylistic change, not a substantive one. The Committee of Eleven that proposed much of the Constitution’s final text primarily regarded the question before it as whether to include the Clause at all. See Charles Warren, The Making of the Constitution 668-71 (1937). Ultimately, the Committee chose to include the Origination Clause in exchange for investing the Senate with the power to choose the President when a majority of the electors were not united for any candidate.[4] Id. at 669 (explaining that “to conciliate those who would be inclined to oppose such an increase of power in the Senate” the Committee adopted “the suggestion which Caleb Strong had made as to revenue bills”). The slight change from Caleb Strong’s proposed wording brooked no recorded comment whatsoever when placed before the Convention, see 2 Farrand’s Records at 508-10 (Sept. 5, 1787), and the Convention specifically adopted the Clause’s “for raising Revenue” language by a vote of 9-2. Id. at 545, 552 (Sept. 8, 1787). One would hardly expect such a united and amicable outcome if the scope of the Clause remained an issue. The foregoing is powerful evidence that the Committee of Eleven did not quietly broaden the Origination Clause’s scope in early September. The best reading of the history is that the Convention finalized the scope of the Clause in mid-August (when it debated the Clause’s purposive language) and delegated to the Committee of Eleven the more limited question whether or not to include it in the Constitution at all. See Warren, supra at 668-71.
What of the dissent’s reliance on statements by Elbridge Gerry and James Madison praising a seemingly broader Origination Clause? The version Gerry championed is not in the Constitution. Gerry criticized the Constitution for rejecting his vision of the Origination Clause, and he cited that rejection as a reason why he refused to sign the Constitution and advocated against its ratification. See Letter of Elbridge Gerry to the Vice President of the Convention of Massachusetts (Jan. 21, 1788), reprinted in 3 Farrand’s Records at 265. Madison extolled the Origination Clause in Federalist 58, not because it gave the House power over all taxes, but because, in his opinion, it vested the House with exclusive power to originate appropriations bills. See The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961) (explaining that the House’s power would derive from its “power over the purse”). Neither *1048 “revenue” nor “tax” is mentioned in Federalist 58. Id. at 356-61. And at the Convention itself, Madison appeared vocally to oppose the Clause. See 2 Far-rand’s Records at 224 (Aug. 8, 1787); id. at 276-77 (Aug. 13, 1787).
Because the Supreme Court has instructed us how to decide Origination Clause questions, this case presents no occasion for a comprehensive historical inquiry. But even the modest look we take here demonstrates that the gloss given by the dissent is wide of the mark.
E.
In addition to evidence from the framing and ratification, early constitutional history confirms that the Origination Clause’s expected application was through a purpose-based test. St. George Tucker, writing in 1803 in the first major treátise on American law, argued that the Origination Clause should be read in light of English practice and therefore sweepingly construed to prevent the Senate from raising revenue through even “indirect modes of taxation” such as “debasing the value of the coin.” St. George Tucker, Blackstone’s Commentaries 261 (1803). Tucker, however, was forced to acknowledge, in a lengthy footnote, that the practice of the first Congresses had already shown that those bodies thought the Origination Clause was quite narrow, and that laws that raised revenue, even “to a very considerable amount,” did not implicate' the Origination Clause unless “revenue was intended to be drawn to the government by these laws.” Id. at 261 n. § (1803).
Justice Joseph Story, writing in 1833 in his own Commentaries on the Constitution, commented on Tucker’s treatment of the Origination Clause, explaining that “[a] learned commentator[, Tucker,] supposes, that every bill, which indirectly or consequentially may raise revenue, is, within the sense of the constitution, a revenue bill.” 2 Joseph Story, Commentaries on the Constitution § 877, at 343 (1833). Justice Story went on to explain that “the practical construction of the constitution has been against his opinion,” id., and that “the history of the origin of the power, already suggested, abundantly proves, that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue,” id.
Justice Story’s views form the basis of controlling precedent in this court and in the Supreme Court. In deciding the first appeal of Twin City Nat’l Bank v. Nebeker, this court quoted extensively from Justice Story’s Commentaries on the Constitution. The opinion noted Story’s recognition that there were two views of the Origination Clause: a view that “supposes that every bill which indirectly or consequentially may raise revenue is, within the sense of the Constitution, a revenue bill,” and the superior view that “it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue.” 3 App.D.C. 190, 201 (1894) (quoting 1 Joseph Story, Commentaries on the Constitution § 880); see also United States v. Norton, 91 U.S. 566, 569, 23 L.Ed. 454 (1875) (citing Justice Story’s views approvingly). The Supreme Court concluded, as we did then and must again here, that the latter view was correct. 167 U.S. 196, 202, 17 S.Ct. 766 (adopting Justice Story’s views); see also Millard, 202 U.S. at 436, 26 S.Ct. 674 (treating Justice Story’s views as having been adopted by the Supreme Court in Nebeker). Justice Story’s comments on Tucker have been quoted in Supreme Court opinions on the Origination Clause, often as grounds for holding that the law at issue does not come within the scope of *1049 the Clause. See Munoz-Flores, 495 U.S. at 397, 110 S.Ct. 1964; Millard, 202 U.S. at 436, 26 S.Ct. 674.
Early congressional practice, recognized by two of America’s most influential early constitutional scholars and endorsed by one of them (Story), strongly suggests that the original expected application of the Origination Clause was purposive. Most importantly, in our view, that is the approach that was adopted and has been reaffirmed by the Supreme Court.
For these reasons, the dissent from the denial of rehearing en banc presents no basis for the en banc court to revisit the holding that Sissel’s challenge to the mandate in section 5000A of the Affordable Care Act does not come within the scope of the Origination Clause. In adhering to Supreme Court precedent adopting a purposive interpretation, the panel opinion honors the balance of power between the two Houses of Congress as envisioned by the Framers, thereby safeguarding individual liberty. There is no basis for the dissent’s accusation to the contrary. See Dissent at 1059-60. The court has correctly voted to deny rehearing en banc.

. Indeed, the Supreme Court in Munoz-Flores affirmatively rejected the test that the Ninth Circuit had adopted, and that the dissent today commends, under which any Senate-originated bill that in fact raises funds for “general revenue" violates the Origination Clause. See 863 F.2d 654 (9th Cir.1988), rev’d, 495 U.S. 385, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). The Court of Appeals for the Ninth Circuit had held in Munoz-Flores that the special assessment made its legislative vehicle a revenue bill because “Congress contemplated that the revenue might be used as general federal revenue” and “Congress failed to restrict the use of the monies assessed ... in any way, so that they might be shifted to another purpose at any time.” 863 F.2d at 659. The Supreme Court disagreed, stating that "a bill creating a discrete governmental program and providing sources for its financial support is not a revenue bill simply because it creates revenue.” 495 U.S. at 400, 110 S.Ct. 1964.

. The dissent suggests that it "makes little sense” for the panel to conclude that the Origination Clause "magically” does not apply to the ACA even though, had the ACA been two bills, a tax bill and a spending bill, the Origination Clause would have applied to the tax bill. Dissent at 1054. The same criticism could have been leveled against the bills at issue in Munoz-Flores, Millard, and Nebeker.

. Rehearing is not appropriate on an issue that no party raised, briefed or argued to the panel, the panel did not consider, and that was not even advanced in the losing party’s petition for rehearing. See King v. Palmer, 778 F.2d 878, 883 (D.C.Cir.1985) (Bork, J., concurring in denial of rehearing en banc).

. The Convention rejected the Senate-empowering half of the Committee’s compromise and placed in the House of Representatives the power to choose the President when a majority of the electors were not united for any candidate. See U.S. Const, art. II, § 1, cl. 3; 2 Farrand's Records at 519, 527, 531 (Sept. 6, 1787); 1 George Ticknor Curtis, Constitutional History of the United States 457 (1889).